THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ROBERT GORDON, Defendant-Appellant.

Second District   No. 2—91—0591

Opinion filed July 22, 1993.

G. Joseph Weller, of State Appellate Defender's Office, of Elgin, and Sherry R. Silvern, of Aurora, for appellant.

Michael J. Waller, State's Attorney, of Waukegan, and John M. Carey, of Chicago (William L. Browers, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE QUETSCH delivered the opinion of the court:

After a bench trial, defendant, Robert Gordon, was convicted of aggravated battery to a senior citizen (Ill. Rev. Stat. 1989, ch. 38, par. 12—4(b)(10) (now, as amended, 720 ILCS 5/12—4(b)(10) (West 1992))) and robbery (Ill. Rev. Stat. 1989, ch. 38, par. 18—1 (now 720 ILCS 5/ 18—1 (West 1992))). He was sentenced to concurrent three-year prison terms. On appeal, defendant argues that (1) he was not proved guilty beyond a reasonable doubt of either offense; and (2) he did not receive the effective assistance of counsel. We affirm defendant's conviction of aggravated battery to a senior citizen. We reduce defendant's conviction of robbery to attempted robbery.

On the afternoon of October 14, 1990, several young men riding bicycles attacked Aileen Prasti, an 82-year-old woman, as she was walking east on Dugdale Avenue in Waukegan. Defendant and his brother, Conan Gordon, were each charged with two counts of aggravated battery (Ill. Rev. Stat. 1991, ch. 38, par. 12—4(a) (now 720 ILCS 5/12—4(a) (West 1992))) and one count of aggravated battery to a senior citizen. Defendant was also indicted for robbery. Initially, Conan Gordon was indicted for robbery, but later he pleaded guilty to an amended charge of attempted robbery (Ill. Rev. Stat. 1991, ch. 38, pars. 8—4(a), 18—1(a) (now 720 ILCS 5/8—4(a), 18—1(a) (West 1992))).

On November 8, 1990, the trial court received a pretrial bond report on defendant. The report stated that defendant, who was 18 years old at the time, appeared to be developmentally disabled. Defendant could not read and was taking special education classes. He had difficulty understanding spoken communications or "comprehending time spans," and he appeared to have "no comprehension of the judicial system." No pending charges against him had been discovered.

Noting this information, the trial court ordered that defendant be evaluated for his fitness to stand trial. On December 19, 1990, the court received a report from Dr. Alfred Marx, who concluded that, despite defendant's limited intellectual capacity, defendant was fit to stand trial. Although defendant was slow to understand questions, he could do so if the questioner used simple language and sufficient repetition. Defendant understood the charges against him, and he had a general understanding of "what a plea is," the court process, and the

possible consequences of being convicted of the charges against him. Defendant was able to read the various police reports that the State had disclosed, although he did so slowly and haltingly. He summarized the various accounts of the incident and gave his own exculpatory version. Dr. Marx opined that defendant would be able to communicate with counsel and could assist counsel in his defense.

On February 11, 1991, defendant's counsel filed an answer to a State discovery motion. The answer listed defendant's mother and sister, with whom he resided at 801 Cummings in Waukegan, as possible witnesses. The answer stated that defendant might assert the affirmative defense of alibi, *i.e.*, that he was at home at the time of the incident. Also listed as a possible witness was Ingrid Smith, defendant's special education teacher at Waukegan High School.

On March 22, 1991, defendant filed a motion to suppress any statements defendant made at the time of his arrest. The motion argued that statements that he sought suppressed were involuntary because they resulted from psychological coercion. Specifically, the motion stated that, directly after defendant was arrested on October 21, 1990, he was interrogated by Sergeant Hendley, who showed defendant a prepared statement and told defendant that if the latter did not sign the statement Hendley would throw him "against the wall."

At a hearing on March 27, 1991, defendant's attorney stated that Ingrid Smith would testify from her experience about defendant's inability to read or comprehend the *Miranda* forms or the written statement he allegedly signed. The trial judge noted that the written motion to suppress argued only that the statement was the result of coercion and not that the statement should be barred because defendant did not knowingly and intelligently waive his *Miranda* rights. The judge allowed defense counsel to amend the motion orally to include this ground for suppressing the statement. The court decided that the trial and the hearing on the motion to suppress would proceed together.

The State's first witness at trial was Virginia Correa, who testified that, at about 2:30 p.m. on October 14, 1990, she was riding to work with her father. It was raining and her father was driving slowly. As they approached the Waukegan Developmental Center, where she worked, she noticed that Prasti (whose photograph she identified in court) was walking east on Dugdale. Three young black males were behind Prasti, riding their bicycles very slowly. As Correa looked at them, two of the young men looked back at Correa. Each of these two was wearing a red and black checked flannel shirt. The third man, who did not look at Correa, was wearing a dark blue

jacket and a blue baseball cap. Two of the young men, including the one in the blue jacket, grabbed Prasti and lifted her up. The one in the blue jacket attempted to grab her purse. The two men dropped Prasti to the ground. The third kicked her.

As she watched, Correa told her father of the incident. Both of them got out of the car to help the victim. The three young men rapidly left the scene. Correa's father pursued them by car but could not catch up with them. He went to the fire station to find somebody to help the victim.

At trial, Correa unequivocally identified defendant as the young man who had been wearing the blue jacket. She related that although defendant did not look directly at her during the incident, she had come to within 10 to 15 feet of him and saw the front and side of his face for about 30 to 45 seconds. Although the weather was drizzly, it was not overcast.

Correa never picked the defendant out of a lineup, and she did not see defendant in the six months between the incident and the trial. She recognized him in court because she remembered his face. She had never seen any of the young attackers before the incident. On the day of the incident, Correa described the men to the police. She described defendant as about 5 feet, 6 inches, 135 pounds, and 17 or 18 years old. Correa looked at photographs, but she did not identify the other two attackers. She told police that one of the people photographed looked like defendant; however, she did not identify this person as defendant because she did not believe that he was defendant. She learned later that this person was not defendant.

Sergeant Paul Hendley of the Waukegan police department testified next. After identifying defendant in court, he stated that he spoke to defendant at the police station at about 5:15 p.m. on October 21, 1990. Defendant was at the station because he had been arrested for possessing a stolen bicycle. Defendant had been brought to the station before Hendley came to work at 3:45 p.m. To Hendley's knowledge, none of the officers had by then questioned defendant about the attack on Prasti.

Hendley and defendant were alone for most of the interview. Before asking defendant about the attack on Prasti, Hendley read defendant *Miranda* warnings from a standard form (admitted at trial as People's exhibit No. 4). Hendley explained the form to defendant and told him to say whether he understood each of his rights as Hendley read them from the form. Defendant consistently answered "yes" when Hendley asked him if he understood, and he signed the form in Hendley's presence. Defendant never indicated that he did

not understand his rights. Hendley never asked defendant to read the form. Defendant appeared to read the form silently as Hendley read it aloud. Hendley was not aware at the time that defendant was a special education student, and Hendley had no information about defendant's reading ability.

Hendley denied having used any coercion in getting defendant to make the statement or sign any of the documents. He did not tell defendant that the latter had to sign the statement or Hendley would "throw his skinny ass against the wall." Hendley never told defendant that defendant could go home only after signing the statement. This would not have made sense, because defendant was already under arrest for bicycle theft. Defendant never told Hendley that his account was a mere retelling of what Conan Gordon had told defendant about the incident.

After speaking with defendant about the stolen bicycle, Hendley asked defendant if the latter had been on Dugdale Avenue on October 14, 1990. Defendant replied that he and two other individuals had been on Dugdale that day. He gave Hendley a detailed description of what happened. Hendley recorded defendant's description and reduced it to a three-page typed statement that he read to defendant. Defendant approved the contents of the statement as written. He signed the statement in the presence of Hendley and Detective Michael Donnenwirth.

Defendant's statement, admitted into evidence as People's exhibit No. 5, gives the following account of the attack on Prasti. On October 14, 1990, defendant, his brother Conan, and Todd Jenkins rode their bicycles to the Belvidere Mall. They left after going to Walgreens. On the way back, they saw "the older white lady." Jenkins rode up to defendant and said to defendant that he needed money and that they would get money from the woman. Defendant and Conan Gordon rode up beside the woman; they grabbed her arms and she fell to the ground. As the two brothers held the woman, Jenkins approached and hit her a few times. She refused to give up her purse, so Jenkins went through her pockets. Jenkins said that he got some money, but neither Conan Gordon nor defendant ever saw any money. Defendant heard a man driving out of the driveway shouting "What are you guys doing?" The three youths escaped on their bicycles. Defendant had not seen Jenkins since the incident.

After making his statement, defendant helped Hendley to fill in a rough map of the crime scene. Defendant told Hendley where to place numbers representing the various participants, including the driver of

the car. Defendant and Hendley signed the map, which was admitted as People's exhibit No. 6.

Detective Donnenwirth testified that he was "in and out" of the interview room while Hendley interviewed defendant. At this time, Donnenwirth did not know whether anyone had identified defendant as being involved in the attack on Prasti. Defendant told the two officers that three people participated in the attack: defendant, Conan Gordon, and a friend named Todd. Defendant never mentioned Terry Brown or Prentice Black.

Donnenwirth accompanied Hendley to the interview room when Hendley returned with the typewritten statement for defendant to sign. Donnenwirth signed People's exhibit No. 5 as a witness after Hendley read the statement to defendant and defendant told Hendley the statement was correct. Donnenwirth testified that the written statement matched what he heard Hendley read to defendant. Donnenwirth never heard Hendley try to coerce defendant into signing the statement. Donnenwirth was present when defendant helped Hendley fill in People's exhibit No. 6. At the time of the interview, Donnenwirth did not know whether defendant was enrolled in any special education classes. He did not ask defendant if defendant could read. To his knowledge, Hendley did not ask defendant this question either.

Defendant testified for the limited purpose of the motion to suppress. He stated that he was 18 years old and currently attending Waukegan West High School. From grammar school on, he had been enrolled in special education classes.

Defendant recalled his arrest and his interview with Sergeant Hendley. As he recalled, it was about 2:30 p.m. when he first spoke with Hendley. He conceded that he was not aware Sergeant Hendley's shift did not start until about 4 p.m.

Defendant recognized People's exhibit No. 4, but he testified he did not read it on the day of his arrest because he could hardly read it then. Defendant read parts of the form at trial. He stated he did not understand all of what he read. He signed People's exhibit No. 5, but he did not read it first.

Defendant related that he signed both forms after Hendley "forced" him to do so. According to defendant, Hendley pounded the table and said, "Damn it. Sign these statements." Hendley threatened to throw defendant's "black ass through the wall" or throw defendant's "skinny black self through the wall" unless defendant signed the statements. Hendley also said defendant could not go home until he signed the statements.

Defendant testified that he signed People's exhibit No. 6 at about 3 a.m. after Hendley told him that he could go home if he signed it. Although defendant told Hendley where to put the numerous markings on the sketch, defendant "just made up anything. I ain't really know nothing about this." Defendant related that Detective Donnenwirth did not enter the interview room until after defendant signed the paper.

After defendant testified, the State rested. Defendant's counsel stated that he had decided to call Ingrid Smith, defendant's special education teacher. The court granted a continuance so Smith could appear and defense counsel could subpoena the relevant school documents.

Defendant's first witness for the trial was Prentice Black, who was 16 years old at the time of trial and 15 when he participated in the attack on Prasti. He, Terry Brown, and Conan Gordon were riding their bicycles on Dugdale back from Lakehurst Mall. Black's coat and jacket were both red and black. Conan Gordon wore a red and black flannel shirt. Brown wore a gray coat with a maroon stripe. At no time did Black see defendant.

As Black, Brown, and Conan Gordon rode up behind the victim, Black snatched her purse out of her left hand. The purse strap became caught on his bike's handlebar, causing Black to stop and Prasti to fall. A car approached from down the street; the youths left. Later, Black was arrested. He pleaded guilty to attempted armed robbery. At the time of defendant's trial, Black was serving time in the Department of Corrections.

Terry Brown testified that he was 16 years old at the time of defendant's trial and 15 when he participated in the attack on Prasti on October 14, 1990. That day, Brown, Black, and Conan Gordon rode their bicycles to Lakehurst Mall and back. Defendant, whom Brown knew, was not with them. Brown's description of the attack was fairly consistent with Black's. Brown testified that at the time of the attack he was wearing gray pants, a light gray jacket with a blue inside pattern and blue stripes on the sleeves, a black shirt, and a cap. Eventually, Brown pleaded guilty to "attempted robbery or something."

On cross-examination, Brown admitted that on October 22, 1990, he spoke to Waukegan police detectives Jackson and Pratt and signed a statement afterward. Brown testified that he never told the detectives that defendant was with the other three young men on the date of the attack on Prasti, as defendant had not in fact been with them. Brown acknowledged that he erred in telling the detectives that the

group had gone to the Belvidere Mall; he now remembered that he and his friends had been at the Lakehurst Mall. Brown denied having told the officers that defendant accompanied Black and Conan into a store at the mall. Brown admitted that he told the police that he kicked Prasti after she fell and that he demonstrated this maneuver to the officers. However, he testified that he lied to the detectives because one was yelling at him; in fact, he never kicked Prasti.

After Brown's testimony, defendant's attorney told the court that he had decided not to call Ingrid Smith as a witness at the hearing on the motion to suppress. Subsequently, the trial court ruled against defendant on the motion to suppress. The judge held that defendant had not shown that he lacked an understanding of his rights. Also, the judge found Hendley and Donnenwirth credible and disbelieved defendant's account of their conduct at the interview. Thus, the judge concluded that the defendant's statements were voluntary and would be admitted.

Defendant called Conan Gordon, who acknowledged that he had pleaded guilty to attempted armed robbery and had been sentenced to the Department of Corrections. Conan Gordon testified that he was home with his family early on the morning of October 14, 1990, when Prentice Black came by to visit. Terry Brown later came along. At about 11:30 a.m., the three youths rode their bicycles to Lakehurst Mall. Defendant remained at home, and Conan Gordon next saw his brother when Conan returned home after the attack on Prasti. Todd Jenkins, a friend of defendant's, did not accompany Conan, Black, or Brown that day.

At about 2 p.m., the three youths headed home along Dugdale. Black rode ahead of Conan; Brown rode behind. Black rode up to Prasti and grabbed her purse. She held onto the purse and fell. As Conan rode up, Black and Brown were trying to get the purse. A car approached from the opposite direction and stopped nearby. Conan, Brown and Black left the scene.

Conan Gordon could not recall for sure what he wore on October 14, 1990. He did not remember what defendant wore that day. Black wore a red and black coat with dark jeans. Brown wore a dark gray jacket, jeans, and a cap.

Conan Gordon admitted that he talked to Detective Michael Taylor of the Waukegan police department, that he signed a statement that Taylor witnessed, and that the statement contradicted much of his testimony. According to the statement, defendant accompanied the other three youths to and from the mall. On the way back, defendant

rode ahead of Conan. After the attack on Prasti, the driver of the brown car yelled at Conan Gordon.

In rebuttal, the State called Waukegan police officer Michael Jackson, who stated that, on October 22, 1990, he talked to Terry Brown at the station and typed up a statement that Brown read and signed. Jackson and Detective Pratt also signed the statement. Brown's statement said that he was with defendant on October 14, 1990, including when Brown was at Walgreens.

Defendant testified that he recalled October 14, 1990. He spent the day at home and did not see Prentice Black, Terry Brown, or Todd Jenkins the whole day. Defendant was not on Dugdale Avenue that day. His brother Conan returned home that afternoon and told defendant all about the incident on Dugdale, including who else was there at the time. Until he heard this account, defendant knew nothing about the attack on Prasti.

On cross-examination, defendant conceded that, after he was arrested on October 22, 1990, he told Sergeant Hendley that he, Conan Gordon, and Todd Jenkins had taken part in the events of October 14. Defendant told the officers that the three youths rode their bikes to the Belvidere Mall and were returning along Dugdale when they saw Prasti. Jenkins told defendant to stop, as they could get money from Prasti. They rode up alongside her. Defendant grabbed Prasti's arms. She fell to the ground. While Conan and defendant held Prasti down, Jenkins hit her several times and tried to get Prasti's purse; she would not let him have it. Defendant may have heard a man in a car shouting at the group. The youths got on their bikes and rode home.

Defendant testified that he lied when he told Hendley that he had grabbed Prasti. Also, defendant stated on redirect examination that he had lied in implicating Todd Jenkins, who was not involved in the attack; defendant had wanted to "pay back" Jenkins for his interest in defendant's 10-year-old sister. On redirect examination, defendant stated that he made up everything he told Hendley and that in reality he did not attack Prasti.

On re-cross-examination, the prosecutor asked without objection if defendant spoke to Detective Howard Pratt about the events of October 14, 1990. Defendant admitted he had done so. He did not remember telling Pratt that, on October 14, 1990, defendant, Conan Gordon, Brown, and Black were out together riding their bicycles. He admitted that he told Pratt he went to Walgreens to buy hair dye; however, he testified that he and the other three young men made this trip on October 12 or 13, 1990.

Defendant also conceded that he gave Pratt the following account of the attack on Prasti. When defendant, Conan Gordon, Black, and Brown rode past "the place where they keep the crazy people," they saw an elderly white woman walking toward Jackson Street. Defendant spoke to the lady; she replied "hi." Defendant stopped and saw Conan Gordon, Black, and Brown beating the woman as she held onto her purse. At trial, defendant stated that he made up this story, including the names. He also made up the account of the car's driver yelling at the youths. Nobody told him about this incident; defendant made it up "just poof."

In rebuttal, the State called Waukegan police detective Michael Taylor. Taylor recollected that, on October 22, 1990, he spoke with Conan Gordon about the incident. Conan told Taylor that on October 14, 1990, Conan, defendant, Brown, and Black rode their bicycles together to Walgreens. Defendant was present during the attack on Prasti, including when a car going west on Dugdale went in and out of a parking lot and the driver shouted at the youths. Taylor read from Conan Gordon's statement, which mentioned that defendant accompanied Conan, Black, and Brown to Walgreens and returned with them, riding ahead of the others.

The trial judge found defendant guilty of aggravated battery and robbery. The judge placed much weight on defendant's statement, explaining that its accuracy and detail negated any inference that defendant had made it up or that defendant merely had repeated what his brother told him. Also, the judge said that he did not believe defendant had testified truthfully; that defendant's statement to Detective Pratt was further evidence of defendant's guilt; and that the eyewitness identification, despite its limitations, also supported the convictions.

Defendant filed a post-trial motion, which the court denied. Although the trial judge equivocated about whether the identification alone established defendant's guilt beyond a reasonable doubt, he stated that the totality of the evidence amply supported defendant's convictions.

Defendant's presentence investigation report noted that he had no prior convictions or juvenile delinquency adjudications. He had been in foster care for a short time in 1983. At the time of the offense, defendant lived at home with his mother, his uncle, two brothers, and two sisters.

The report stated that, before his arrest, defendant was enrolled as an educably mentally handicapped student in a special education program. Defendant had "multiple disabilities," and a 1988 psycholog-

ical test placed defendant in the lowest .1 percentile of the population. Another test rated defendant's functional skills at an "extreme deficit."

Ingrid Smith, defendant's special education teacher for over two years, also spoke with the probation officer who prepared the presentence investigation report. Smith stated that defendant was functioning at the second-grade level academically. His test scores and grades were poor and had declined since he entered high school. However, Smith also described defendant as "street-smart and very manipulative." According to Smith, defendant often tried "to con his peers." He was "easily victimized and tend[ed] to seek out victims of his own."

The court sentenced defendant to concurrent three-year prison terms for aggravated battery of a senior citizen and robbery. Defendant timely appealed.

We turn first to defendant's challenge to the sufficiency of the evidence supporting both of his convictions. We hold that there was ample evidence to convict defendant of aggravated battery to a senior citizen. However, we agree with defendant that there was no credible evidence that anything was taken from the victim. Therefore, we hold that his conviction of robbery must be modified to one of attempted robbery.

In considering whether there is sufficient evidence to support a conviction, we must ask whether all the evidence, when viewed in the light most favorable to the State, is sufficient to convince any rational trier of fact that the State has proven the elements of the offense beyond a reasonable doubt. (*People v. Collins* (1985), 106 Ill. 2d 237, 261.) In reviewing the sufficiency of the evidence, we may consider evidence that allegedly was improperly admitted. (*People v. Furby* (1990), 138 Ill. 2d 434, 453-54.) We do not retry the defendant, and determinations of the credibility of the witnesses, the weight to be given their testimony, and the reasonable inferences to be drawn from the evidence are the responsibilities of the fact finder. *People v. Steidl* (1991), 142 Ill. 2d 204, 226; *People v. Brisbon* (1985), 106 Ill. 2d 342, 360.

We determine that there was ample evidence to place defendant at the scene of the attack as a coparticipant in the attack on Prasti. An eyewitness identified defendant as one of the attackers, and defendant's confession, which the trial judge found was detailed and more plausible than defendant's testimony, also established that defendant was one of Prasti's assailants. The confession was corroborated by ample independent evidence of the *corpus delicti, i.e.,* by

proof that an aggravated battery to a senior citizen and an attempted robbery did occur. A confession that is corroborated by sufficient independent evidence of the *corpus delicti* satisfies the requirement of proof beyond a reasonable doubt. *People v. Dalton* (1982), 91 Ill. 2d 22, 29; *People v. Willingham* (1982), 89 Ill. 2d 352, 359.

■ We do agree with defendant that his conviction of robbery must be reduced to one of attempted robbery. To obtain a conviction of robbery, the State had to prove that property actually was *taken* from the victim's person or presence. (See Ill. Rev. Stat. 1989, ch. 38, par. 18—1(a) (now 720 ILCS 5/18—1(a) (West 1992)).) Essentially, there was no evidence that anybody actually took anything from Prasti. All the evidence suggests that Prasti's assailants went home after an onlooker noticed their bungled attempt to seize Prasti's purse. Defendant's confession stated that Todd Jenkins said that Jenkins had taken money from Prasti, but that nobody else saw any money. The evidence was very strong that Jenkins was not part of the attack; even taken at face value, Jenkins' alleged statement hardly proves that anything was taken. Moreover, nothing outside defendant's confession establishes the *corpus delicti* of a completed robbery as opposed to merely an attempted robbery.

Although we reduce defendant's conviction of robbery to one of attempted robbery, his three-year sentence may stand. As the victim in this case was over 60 years old, robbery would have been a Class 1 felony. (See Ill. Rev. Stat. 1989, ch. 38, par. 18—1(b) (now 720 ILCS 5/18—1(b) (West 1992)).) Thus, attempted robbery is a Class 2 felony. (See Ill. Rev. Stat. 1989, ch. 38, par. 8—4(c)(3) (now 720 ILCS 8—4(c)(3) (West 1992)).) The minimum sentence for a Class 2 felony is three years. (Ill. Rev. Stat. 1989, ch. 38, par. 1005—8—1(a)(5) (now 730 ILCS 5/5—8—1(a)(5) (West 1992)).) As the trial court imposed the minimum sentence for attempted robbery of a person over 60 years old, there is no reason to remand the cause for resentencing.

We turn now to defendant's assertion that he received the ineffective assistance of counsel. Defendant raises four instances of what he claims was ineffective assistance. One of them, that his counsel erred in not arguing that the evidence was sufficient only to convict defendant of attempted robbery rather than armed robbery, is obviously now moot. We turn to the other alleged instances of trial counsel's ineffectiveness. These include (1) counsel's failure to pursue the affirmative defense of alibi after stating in discovery that he would do so; (2) counsel's failure, after the motion to suppress was amended to include an allegation that defendant did not intelligently and knowingly waive his rights, to present easily obtainable evidence that defendant lacked

the intellectual capacity for a knowing and intelligent waiver; and (3) counsel's failure to object during the re-cross-examination of defendant, resulting in the allowance of damaging testimony about defendant's admissions to Detective Pratt. We conclude that, whatever the wisdom of defense counsel's decisions, his overall performance did not deprive defendant of the effective assistance of counsel.

To prevail on a claim that his counsel was ineffective, defendant must show that (1) counsel's performance fell below an objective standard of reasonableness and (2) as a result of counsel's errors, defendant was deprived of a fair, reliable trial. (*Strickland v. Washington* (1984), 466 U.S. 668, 687, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2064; *People v. Steidl* (1991), 142 Ill. 2d 204, 239.) There is a strong presumption that trial counsel's actions were the result of trial strategy and not of incompetence; thus, a court of review will not second-guess matters which involve counsel's discretion or strategy. (*People v. Lopez* (1993), 242 Ill. App. 3d 160, 171; *People v. McCaster* (1993), 239 Ill. App. 3d 753, 757.) Counsel's performance must be evaluated from the perspective of counsel at the time of his actions, not from hindsight. (*People v. Whitamore* (1993), 241 Ill. App. 3d 519, 526.) To establish prejudice, a defendant must establish that there is a reasonable probability that, but for counsel's unprofessional errors, the outcome of the proceeding would have been different. *People v. Barfield* (1989), 187 Ill. App. 3d 190, 197-98.

■ Defendant's allegation that counsel was ineffective in not pursuing the alibi defense is wholly speculative and without merit. Defendant does not even try to show that any alibi witnesses would have testified favorably or credibly. Counsel may well have decided that such witnesses had no plausible exculpatory testimony to offer and that their testimony, if disbelieved, might even undermine defendant's argument that he was not present at the scene of the crime. A defendant who provides no reason for this court to believe that potential witnesses would have helped his case may not prevail on a claim that counsel was ineffective for not calling these witnesses. *People v. Greer* (1980), 79 Ill. 2d 103, 123.

There is more substance to defendant's second allegation of ineffectiveness on the part of his trial counsel. As the presentence investigation report demonstrates, counsel had access to potentially strong evidence that defendant was not capable of a knowing and intelligent waiver of his rights. We are at a loss to understand why counsel failed to produce the evidence of defendant's extremely low intelligence, as reflected by the results of standardized intelligence tests.

■ However, we conclude for a variety of reasons that counsel's performance on this score must be presumed to have been a matter of trial strategy. Counsel had reason to believe that the introduction of evidence relating to defendant's mental abilities would have been (1) minimally helpful on the issue of whether defendant knowingly and intelligently waived his rights; and (2) actually detrimental to defendant's argument that he was coerced into signing the statement—an argument relying on whatever credibility defendant had.

Although the presentence investigation report notes defendant's low intelligence and low level of academic functioning, it does not present a one-sided impression of defendant. Ingrid Smith, who knew defendant well and could not be presumed to be an unfriendly witness, stated that, despite his learning disabilities, defendant was "street smart" and accustomed to "conning" and manipulating others. A defendant whose intelligence quotient is far below normal may very well be found capable of properly waiving his rights. (See, *e.g.*, *People v. Phillips* (1992), 226 Ill. App. 3d 878, 886.) The trial court here had the opportunity to observe defendant as he testified and a pretrial report from a clinical psychologist that defendant's mental limitations did not prevent him from understanding the essential elements of the court process.

Also, Smith's characterization of defendant as manipulative, street smart and eager to look for victims to "con" would likely have detracted from the defendant's credibility in the hearing on the motion to suppress his statements. In hindsight, we may question counsel's handling of this issue, but we cannot say that defendant has overcome the presumption that counsel acted within the broad realm of trial strategy.

We turn to defendant's final example of trial counsel's alleged ineffectiveness. Defendant argues that counsel unreasonably failed to object to the State's re-cross-examination of defendant, in which for the first time the court was informed of defendant's interview with Detective Pratt. Defendant observes that the trial judge considered this evidence damaging to defendant, especially as it undermined defendant's argument that he admitted to involvement in the attack only because Sergeant Hendley threatened him. However, we must note that defendant is incorrect in asserting that the re-cross-examination was a discovery violation; Detective Pratt was timely disclosed as a possible State witness. Also, defendant is incorrect in stating that Detective Pratt was not mentioned in the questioning of any witness until the re-cross-examination to which defendant now refers.

Both Terry Brown and Officer Jackson testified that Detective Pratt questioned Brown about the incident.

The admission of evidence is within the trial court's wide discretion, and a reviewing court will intervene only if there has been a clear abuse of discretion leading to manifest prejudice to the defendant. (*People v. Enis* (1990), 139 Ill. 2d 264, 281.) Here, the interview with Detective Pratt was relevant in that it made defendant's explanation of his confession less plausible. Nonetheless, defendant argues that evidence of the interview was inadmissible because it went to matters beyond the scope of the direct examination; the interview itself was not raised during the direct or redirect examination of defendant.

■ We conclude that trial counsel's failure to object to this line of questioning will not support a claim of ineffectiveness based on the theory that the questioning exceeded the scope of defendant's testimony on direct examination. This limitation "is *** construed liberally to allow inquiry into whatever tends to explain, qualify, modify, discredit, or destroy the testimony on direct." (M. Graham, Cleary & Graham's Handbook of Illinois Evidence §611.11, at 418 (5th ed. 1990), citing *People v. Gacho* (1988), 122 Ill. 2d 221, 247.) As we have noted, the evidence of the interview with Detective Pratt fits this characterization. Moreover, although the trial judge noted that this evidence was damaging to defendant, it appears from the judge's explanation of his decision that defendant's detailed and corroborated confession persuaded the court to reject the defense theory that defendant was not at the scene of the incident. Thus, defendant has not made the requisite showing of prejudice.

We affirm defendant's conviction of aggravated battery to a senior citizen. Pursuant to Supreme Court Rule 615(b)(3) (134 Ill. 2d R. 615(b)(3)), we reduce the defendant's conviction of robbery to a conviction of attempted robbery.

The judgment of the circuit court of Lake County is affirmed as modified.

Affirmed as modified.

McLAREN and GEIGER, JJ., concur.