STATE OF CONNECTICUT *v.* CYRUS GRIFFIN
(AC 23271)

Foti, Bishop and Stoughton, Js.

Argued February 13--officially released June 17, 2003

 

*Moira L. Buckley*, deputy assistant public defender, for the appellant (defendant).

*Christopher T. Godialis*, assistant state's attorney, with whom, on the brief, was *Michael Dearington*, state's attorney, for the appellee (state).

*Opinion*

FOTI, J. The defendant, Cyrus Griffin, appeals from the judgment of conviction, rendered after a jury trial, of manslaughter in the first degree with a firearm in violation of General Statutes § 53a-55a (a)[1] and carrying a pistol without a permit in violation of General Statutes § 29-35.[2] The three issues raised by the defendant on appeal relate to the trial court's denial of his motion to suppress the oral confession that he gave to the police following his arrest. The defendant claims that the court improperly (1) excluded certain expert testimony during the hearing on his motion to suppress, (2) admitted into evidence testimony concerning his oral confession after concluding that he had knowingly, intelligently and voluntarily waived his rights pursuant to *Miranda*,[3] and (3) admitted into evidence testimony concerning his oral confession after concluding that he had not exercised his right to remain silent. We affirm the judgment of the trial court.

---

[1] The state charged the defendant with murder in violation of General Statutes § 53a-54a (a); the jury convicted the defendant of the lesser included offense of manslaughter in the first degree with a firearm.

[2] The state also charged the defendant with one count of larceny in the second degree in violation of General Statutes § 53a-123 (a) (3) and one count of robbery in the second degree in violation of General Statutes § 53a-135 (a) (1). The jury acquitted the defendant of these additional charges.

[3] See *Miranda* v. *Arizona*, 384 U.S. 436, 478–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

From the evidence adduced at trial, the jury reasonably could have found the following facts. At or around 2 p.m. on January 29, 1998, Denard Lester, accompanied by the defendant, robbed the eighteen year old victim, Tyshan Allbrooks, in New Haven. Lester took from the victim what witnesses described as a necklace or a medallion made of gold. The victim immediately went to a friend's nearby house, reported the incident to the police and, during an interview, provided a statement to the police who had responded to her complaint. After the robbery, the defendant, Lester and Tobias Greene were passengers in an automobile being operated by Paul Little. The defendant and Lester were fourteen years of age; Greene and Little were sixteen years of age.

A short time later, at or around 2:45 p.m., the victim was walking along Whalley Avenue in New Haven when she was seen by the defendant, who was in the automobile with his acquaintances and was aware that the victim had reported the robbery to the police. The defendant remarked that "snitches get stitches," got out of the automobile and chased the victim on foot. The victim ran to a convenience store where she asked an attendant to call for assistance. The defendant caught up to the victim, and shot her twice in the chest and four times in the back with his pistol, thereby causing her death.

Prior to trial, on April 5, 1999, the defendant filed a motion to suppress "potential testimony and other evidence of any statements made by the Defendant." It is not contradicted that, on February 2, 1998, police detectives arrested the defendant in an apartment in New Haven after they discovered him hiding in a closet. The police thereafter took the defendant to the New Haven police department where Detectives Leroy Dease and Gilbert Burton interviewed him. At trial, Dease testified that the defendant told him that Lester had taken the victim's necklace from her and that after the

robbery, the defendant, Lester, Greene and Little drove around New Haven. Dease further testified that the defendant told him that Greene, upon observing the victim walking across an intersection, ordered him to get out of the car and shoot the victim. Dease then testified that the defendant confessed that he followed the victim to the convenience store and, with Greene standing nearby, "pulled out his small pistol and shot [the victim] several times." According to Dease, the defendant also told him that he was afraid that Greene was going to shoot him and believed that Greene had ordered him to shoot the victim because he owed Greene $300. Burton testified that he was present during the defendant's arrest and interview, and testified as to the circumstances under which the defendant made his confession.

The defendant supported his motion to suppress by asserting that he had made the statements, in which he confessed to having shot the victim, without having voluntarily, knowingly and intelligently waived his privilege against self-incrimination; that he had made the statements involuntarily in violation of his due process rights and that the police had obtained the statements in violation of his right to counsel. The court conducted an evidentiary hearing on the defendant's motion and, on May 17, 2001, granted the motion in part and denied the motion in part. The court suppressed any statements that the defendant had made to the police after such time when the police attempted to tape-record their interview, when, as the court found, the defendant had expressed his desire to terminate the police questioning. The court permitted testimony concerning the defendant's oral confession prior to that point. Additional facts will be set forth as necessary.

I

The defendant first claims that the court improperly excluded certain expert testimony during the hearing on his motion to suppress. We disagree.

The following additional facts and procedural history are relevant to that issue. On April 19, 2001, prior to the hearing on the defendant's motion to suppress, the state filed a motion in limine to exclude "any and all opinion testimony of any expert witness regarding the waiver of *Miranda* rights predicated upon an evaluative protocol created by Thomas Grisso or related to such protocol." The state argued that such evidence was based on "scientific, technical and/or specialized knowledge which is unreliable."

At the evidentiary hearing on the defendant's motion to suppress and the state's motion in limine, the defendant elicited testimony from Madelon V. Baranoski, a clinical psychologist employed by the Connecticut Mental Health Center at Yale University. Baranoski also is an associate clinical professor at Yale and the associate director of the Yale court clinic, which is affiliated with the law and psychiatry division of Yale's department of psychiatry. Baranoski testified that as part of her professional duties, she evaluates approximately 200 separate defendants in an average year to evaluate whether they are competent to stand trial.

Baranoski testified that evaluating an individual's competency in regard to a particular stage of trial proceedings involves identifying what tasks are involved at such stage of the proceedings, and determining whether the individual possesses the competency to understand the issues and tasks related thereto. She testified that she evaluated the defendant to determine whether he possessed the competency to understand his *Miranda* rights. Baranoski explained that her evaluation involved several methods: A clinical interview, IQ testing, personality testing, testing for reading and spelling proficiency, testing for arithmetic ability and general achievement testing. In addition to testing the defendant to determine his "overall competency," Baranoski also tested the defendant with a "set of questions that

had to do with the specific tasks in understanding the *Miranda* warning and making a choice to waive the rights."

Baranoski explained that those questions were part of a protocol developed by Thomas Grisso, a forensic psychologist who has devoted his professional efforts to issues regarding "juvenile competency" and who works with a research group that researches issues of competency. She also testified that the Grisso testing "instrument," which is part of the study protocol, consists of four parts[4] that are scored by the test administrator.

Baranoski explained the defendant's results as to each aspect of the Grisso test; she reported that he scored in the bottom 20 percent of juvenile test takers. She opined, on the basis of the defendant's results on the Grisso test, as well as on the basis of the defendant's results on the other evaluative measures she employed during her evaluation, that the defendant "did not understand the right to remain silent as it applied to incriminating information, and he also did not understand the role of an attorney during the interrogation process."

The state argued in its written motion in limine that expert testimony based on the Grisso protocol was inadmissible under the standard for admissibility of expert testimony set out in *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589–92, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), and adopted by our Supreme Court in *State* v. *Porter*, 241 Conn. 57, 68, 698 A.2d 739 (1997) (en banc), cert. denied, 523 U.S. 1058,

---

[4] The first part tests a person's ability to explain accurately, in his or her own words, what aspects of the *Miranda* warnings mean. The second part tests "recognition" of *Miranda* rights, and the third part tests comprehension of the vocabulary related to the warnings. Finally, the fourth part, which involves pictures and stories about fictional persons being interrogated, tests a person's ability to recognize, during an interrogation, the function of the *Miranda* warnings.

118 S. Ct. 1384, 140 L. Ed. 2d 645 (1998), because it lacked grounding in scientific fact and was based on conjecture and speculation. Following Baranoski's testimony, the state argued further that the testimony concerning the Grisso protocol fell "far short of what is required by *Daubert*" because of the test's rate of error and because the test lacked general acceptance in the appropriate expert community.

In his opposition to the state's motion in limine, the defendant argued that it was "unclear" whether the court should apply a *Daubert* type of analysis to testimony related to or based on the Grisso test. The defendant then addressed the Grisso test's admissibility in terms of the criteria for admissibility set forth in *Daubert*. The defendant's counsel argued that the Grisso test was admissible under what he termed *Porter*'s "liberal standard of admissibility."

On October 23, 2001, the court issued a memorandum of decision wherein it granted the state's motion in limine. The court deemed inadmissible Baranoski's testimony insofar as it concerned the Grisso test and her expert opinion insofar as it was based, in whole or in part, on the results of the defendant's performance on such test. The court based its ruling on its conclusion that the evidence related to the Grisso testing was inadmissible under *Daubert*. The court concluded that the defendant had failed to prove that "the methodology underlying the technique is scientifically valid."

Although the defendant's first claim concerns whether the court properly excluded Baranoski's testimony, insofar as it concerned or was based on the Grisso testing, the claim has two parts. First, the defendant argues that the court improperly subjected her testimony to a *Daubert* analysis.[5] Second, the defendant

---

[5] The state argues that the defendant did not preserve the first aspect of the claim for our review. We disagree. In his opposition to the state's motion in limine, the defendant argued as follows: "Given that the Grisso test is based on a recognized and accepted approach to competence-based testing

argues that, even if the court properly applied *Daubert*, the court abused its discretion by excluding the evidence. We will address each issue in turn.

## A

### Applicability of a *Daubert* Analysis

The defendant in his principal brief argues that "simply because Baranoski testified regarding a specific and less recognized area of mental competency (competency of a juvenile to waive *Miranda* rights) does not mean the relevant methodology [she used] and [her] testimony were subject to the 'gatekeeper' analysis . . . ." The defendant further argues that the court "only had to use its 'powers of observation and comparison' to understand the scoring protocol of the [Grisso test] since it was based on a simple comparison of [the defendant's] answers to the answers provided by the target group of juveniles from the initial . . . study."

The following discussion of *Daubert* is instructive. "In *State* v. *Porter*, [supra, 241 Conn. 66–68, our Supreme Court] adopted the standard for admissibility of scientific evidence as set forth by the United States Supreme Court in *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*, [supra, 509 U.S. 587–89], which disavowed

---

within the field of psychology, it is unclear that the *Daubert* test is applicable in this case. . . . Given that the Grisso protocol is merely a tool relied upon by a well qualified forensic psychologist, which builds upon a well established task of assessing competency of individuals, there is no need for further inquiry on the matter. Assuming, *arguendo*, that a *Daubert* inquiry is appropriate, the Grisso protocol meets those requirements." (Citations omitted; emphasis in original.) The defendant consistently argued, nonetheless, that the evidence was admissible under *Daubert*.

Although that precise aspect of the defendant's claim was not the centerpiece of the debate concerning the admissibility of the challenged testimony, we conclude that the defendant sufficiently articulated his claim before the trial court, which resolved the issue adversely to him. Accordingly, this is not a situation in which our consideration of a claim raised on appeal would result in "a trial by ambuscade of the trial judge." (Internal quotation marks omitted.) *State* v. *Meehan*, 260 Conn. 372, 390, 796 A.2d 1191 (2002).

and liberalized the previously held general acceptance standard for scientific evidence established in *Frye* v. *United States*, 293 F. 1013 (D.C. Cir. 1923). . . .

"Under *Daubert*, before proffered scientific evidence may be admitted, the trial court must determine whether the proffered evidence will assist the trier of fact . . . . *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*, supra, 509 U.S. 589. This entails a two part inquiry: whether the reasoning or methodology underlying the [scientific theory or technique in question] is scientifically valid and . . . whether that reasoning or methodology properly can be applied to the facts in issue. . . . In other words, before it may be admitted, the trial judge must find that the proffered scientific evidence is both reliable and relevant. More specifically, the first requirement for scientific evidence to be admissible . . . is that the subject of the testimony must be scientifically valid, meaning that it is scientific knowledge rooted in the methods and procedures of science . . . and is more than subjective belief or unsupported speculation. *State* v. *Porter*, supra, 241 Conn. 63–64, citing *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*, supra, 592–93.

"The [*Daubert*] court listed four nonexclusive factors for federal judges to consider in determining whether a particular theory or technique is based on scientific knowledge: (1) whether it can be, and has been, tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error, including the existence or maintenance of standards controlling the technique's operation; and (4) whether the technique is, in fact, generally accepted in the relevant scientific community. [*Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*, supra, 509 U.S.] 593–94. *State* v. *Porter*, supra, 241 Conn. 64. The court in *Daubert* further articulated, however, that the inquiry is . . . a flexible one. *Daubert* v. *Merrell Dow Pharmaceuti-*

*cals, Inc.*, supra, 594. To the extent that they focus on the reliability of evidence as ensured by the scientific validity of its underlying principles, [other factors] may well have merit . . . . Id., 594–95 n.12.

"Under *Daubert,* scientific evidence must also fit the case in which it is presented. Id., 591. In other words, proposed scientific testimony must be demonstrably relevant to the facts of the particular case in which it is offered, and not simply be valid in the abstract. *State* v. *Porter,* supra, 241 Conn. 65. Finally, the *Daubert* court emphasized that even if a scientific theory or technique would be admissible under the aforementioned criteria, it can still be excluded for failure to satisfy some other federal rule of evidence. *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.,* supra, 509 U.S. 595. Most important, proffered scientific testimony can still be excluded for failure to satisfy rule 403 of the Federal Rules of Evidence, which allows for the exclusion of relevant evidence if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury . . . . *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.,* supra, 595." (Citation omitted; internal quotation marks omitted.) *State* v. *Kelly,* 256 Conn. 23, 72–74, 770 A.2d 908 (2001).

In regard to the issue of when a *Daubert* analysis is appropriate, our Supreme Court has stated: "Although this court in *Porter* explicitly adopted the *Daubert* test to determine the admissibility of scientific evidence . . . we did not explicitly overrule Connecticut precedent regarding the evidence to which such a test should apply. Prior to *Porter,* this court had recognized that the *Frye* test for admissibility should not apply to all expert testimony, but only to that which involves 'innovative scientific techniques . . . .' *State* v. *Borrelli,* 227 Conn. 153, 163, 629 A.2d 1105 (1993); *State* v. *Hasan,* 205 Conn. 485, 489, 534 A.2d 877 (1987). In *Porter,* we recognized that *Daubert*'s vagueness as to how and

when to apply the factors of the test was necessary. . . . In order to maintain flexibility in applying the test, we did not define what constitutes 'scientific evidence.' " (Citations omitted.) *State* v. *Reid,* 254 Conn. 540, 546, 757 A.2d 482 (2000).

In *Reid,* our Supreme Court held that expert testimony concerning microscopic hair analysis was not subject to a *Daubert* analysis. The court stated that despite the fact that the challenged expert testimony was based in science, the testimony was "about a subject that simply required the jurors to use their own powers of observation and comparison. During his testimony, [the expert witness] displayed an enlarged photograph of one of the defendant's hairs and one of the hairs recovered from the victim's clothing as they appeared side-by-side under the comparison microscope. [The expert witness] explained to the jurors how the hairs were similar and what particular features of the hairs were visible. He also drew a diagram of a hair on a courtroom blackboard for the jurors. The jurors were free to make their own determinations as to the weight they would accord the expert's testimony in the light of the photograph and their own powers of observation and comparison. The jurors were not subject to confusing or obscure scientific evidence, but were able to use the testimony to guide them in their own determination of the similarity of the two hairs." Id., 547–48.

In reaching its holding, the Supreme Court in *Reid* relied on its decision in *State* v. *Hasan,* supra, 205 Conn. 485. A brief discussion of *Hasan* is illuminating in the present case, as well. The defendant in *Hasan* claimed that the trial court improperly had failed to subject certain expert testimony elicited by the state to a *Frye* analysis. Id., 490. The expert testimony at issue was from a podiatrist who had concluded " 'within reasonable podiatric certainty' "; id., 488; and, on the basis of

his examination of a pair of sneakers and the defendant's feet, that the sneakers belonged to the defendant. Id. The court rejected the defendant's claim.

The *Hasan* court explained that the *Frye* test was applicable in "those situations in which the evidence sought to be admitted is beyond the understanding of the ordinary juror who must sacrifice his independent judgment in deference to the expert. . . . Among the dangers created by such scientific evidence is its potential to mislead lay jurors awed by an aura of mystic infallibility surrounding scientific techniques, experts and the fancy devices employed." (Citation omitted; internal quotation marks omitted.) Id., 490.

The court went on to explain that *Frye*'s analysis "has been either ignored or rejected in cases in which the method used by the expert was a matter of physical comparison rather than scientific test or experiment . . . . Many of these cases have involved identification of bite marks by comparison of the defendant's dental impressions to bite marks found on a victim's body . . . and identification of footprints by comparing shoes found at the crime scene with shoes worn by the defendant . . . . In such cases, the jury is in a position to weigh the probative value of the testimony without abandoning common sense and sacrificing independent judgment to the expert's assertions based on his special skill or knowledge. . . . Furthermore, where understanding of the method is accessible to the jury, and not dependent on familiarity with highly technical or obscure scientific theories, the expert's qualifications, and the logical bases of his opinions and conclusions can be effectively challenged by cross-examination and rebuttal evidence." (Citations omitted.) Id., 490–91.

The *Hasan* court stated that the expert had "testified that the features of the defendant's feet from which he drew his conclusions are very common"; id., 494; and

that the expert testified that there was no science of matching shoes to people. Id. The court concluded that the admissibility of the expert's testimony did not depend on the general acceptance of his theories in the scientific community. Id. The court stated: "His conclusions relied on no advanced technology, nor did he employ scientifically sophisticated methods, the understanding of which lies beyond the intellectual powers of the ordinary layperson. The jury was not required to accept blindly the merit of his conclusions or methods. It had before it the same sneakers which had been examined by the podiatrist and, during the course of the trial, had seen the defendant try them on and walk in them. The value of [the expert's] expertise lay in its assistance to the jury in viewing and evaluating the evidence." Id.

We conclude that the court properly subjected the expert testimony at issue in the present case to a *Daubert* analysis because the Grisso test constituted an "innovative scientific technique." Baranoski testified that the Grisso test is an evaluative tool: It consists of a series of four subtests that are meant to measure juvenile competency relative to *Miranda* warnings. She testified that psychologists have tested the Grisso test and concluded that there is "a consistency in the way it measures what it measures." She testified that the questions in the Grisso test are standardized. Portions of the test include pictures and hypothetical stories, both of which involve situations in which *Miranda* rights are implicated and about which test questions are asked.

Baranoski also testified that a test taker's responses to each inquiry are scored. She testified that "the scores give you an idea of how other people have rated answers consistent with what Grisso had found in his initial development of this tool. So, you look at how those responses compare with other responses that reflected

a strong understanding or a not so good understanding of that particular question. There is an overall score for the test, and the scores are just a way to think about the extent to which a part of this test was understood or not. So, if somebody gets them all right, looking at that, I say, well, compared to other people understanding the section, the person I am evaluating understood it was well as anybody else understood that section."

Baranoski further testified that she scored the defendant's responses to each section of the test and that she compared the scores to a summary of scores compiled by Grisso for his "target group" of test takers. Baranoski testified that this scoring information is set forth in tables provided with the testing materials. Although Baranoski testified that the defendant scored in the bottom 20 percent of juvenile test takers, she testified that the test can not answer the question of whether he understood his *Miranda* rights. Baranoski testified in that regard that she considered the defendant's results on many different tests and that she applied her expertise in evaluating the defendant in reaching her expert opinion that he "did not understand his right to remain silent as it applied to incriminating information, and he also did not understand the role of an attorney during the interrogation process."

We have reviewed Baranoski's testimony and have reviewed the Grisso test instruments. The testing materials, including questions about words and phrases and questions based on hypothetical stories and pictures, constitute a scientific tool designed to assess comprehension of *Miranda* rights. It is difficult to label those instruments as constituting something otherwise. The scoring materials provided with the testing instruments contain detailed instructions as to how each response should be graded. The object of the Grisso test is to assign point values to a test taker's responses and to compare that test taker's scores to the scores of test

takers in Grisso's original study group. The test is based on the premise that the questions, hypothetical stories and pictures effectively will measure comprehension and that the scoring reflects accurately such comprehension.

As such, the Grisso test, and the testimony related thereto, is unlike the expert testimony that was at issue in *Reid* and *Hasan*. Here, the challenged testimony was based on a method employed by the expert witness to assess comprehension. Neither powers of observation, comparison nor common sense, however, could be used to assess the validity of the method underlying the Grisso test and in determining whether it accurately measures what it purports to measure. Instead, the methodology underlying the test rested on novel scientific principles, theory or experiment in the field of psychology. That being the case, the court properly subjected the challenged testimony to a *Daubert* analysis.

## B

### Application of the *Daubert* analysis

We now consider the second part of the defendant's initial claim: Whether the court properly excluded the testimony under *Daubert*.

We first set forth the court's findings and conclusions. The court concluded that the defendant had "failed to prove that the Grisso test has sufficient scientific validity in order for the court to accept it as reliable evidence." The court found that "since the Grisso test was formulated in 1981 . . . it has not been the subject of an adequate amount of testing." The court also found that the test had not been subject to adequate peer review and publication, noting that the defendant attempted to demonstrate stringent peer review and publication by citing publications written by Grisso,

himself. The court labeled Grisso's efforts in this regard as "self-promotion." The court also found that the defendant had not demonstrated that the Grisso test "has been generally accepted in the relevant scientific community."

We note that the defendant, as the proponent of the scientific evidence at issue, bore the burden of proving its admissibility. *State* v. *Porter*, supra, 241 Conn. 87. *Daubert* provides only a *"threshold* inquiry into the admissibility of scientific evidence." (Emphasis in original.) Id., 90. The focus of that inquiry is "whether sufficient indicia of legitimacy exist to support the conclusion that evidence derived from the principle may be profitably considered by a fact finder at trial." Id., 91. We review the court's decision to exclude the proffered evidence under an abuse of discretion standard of review. *State* v. *Pappas*, 256 Conn. 854, 878, 776 A.2d 1091 (2001).

We have set forth the considerations relevant to the court's analysis in part I A. In his principal brief, the defendant argues that the court failed to consider Baranoski's testimony concerning the reliability of the test. The defendant also argues that the court improperly treated as dispositive the fact that the test had not been the subject of publication in journals recognized in the scientific community; it had been the subject only of publications authored by Grisso, himself. The defendant further argues that the court failed to make findings in support of its conclusion that the test had not been generally accepted in the relevant scientific community. Last, the defendant posits that the court "failed to consider Baranoski's qualifications and expertise in particular" and that doing so "would have tipped the balance in favor of admissibility of her testimony regarding the [Grisso test]."

Having reviewed Baranoski's testimony in its entirety, we are unable to conclude that the court

abused its discretion. We are mindful that in reviewing the court's exercise of discretion, we do not second-guess the court's resolution of the issue or ask whether the court might have reached a different outcome. We afford the court "great leeway" in making evidentiary rulings, and such rulings "will be reversed only if the court has abused its discretion or an injustice appears to have been done. . . . The exercise of such discretion is not to be disturbed unless it has been abused or the error is clear and involves a misconception of the law." (Internal quotation marks omitted.) *State* v. *Pare*, 75 Conn. App. 474, 478, 816 A.2d 657, cert. denied, 263 Conn. 924, 823 A.2d 1216 (2003).

All of the court's findings find support in the record. Baranoski's testimony about peer review of the Grisso test was limited; she testified that she recalled a law review article in which the test was discussed, that the test has been discussed at seminars and, she believed, that peer review had occurred when Grisso published certain of his own writings that discussed the Grisso test. The court found that Grisso's own discussion of his test constituted "self-promotion." We are unable to conclude that the court's findings in that regard resulted from an abuse of discretion.

Essentially, Baranoski did not cite any evidence, apart from her beliefs, that supported a finding that the test had gained widespread acceptance in the relevant scientific community. Baranoski testified that the test "is being recognized by forensic psychiatrists and psychologists as a good foundation from which to build future research and refinement of questions. So, it is recognized as a standard way or standard approach to assessing competency." On cross-examination, however, Baranoski did not support those assertions; she testified only that she knew of a "couple of organizations" that use the test and that it had been the subject of a law review article. The defendant argues that Grisso's "work and theories have been widely cited, relied upon

and commented on in case law and law review articles." What is important, however, for purposes of *Daubert*, is whether Grisso's peers in his own scientific community have reviewed and have accepted as scientifically valid his test.

Likewise, despite her other professional experience, Baranoski testified that she had administered the Grisso test only once before to a juvenile and that this was her first time testifying about the test in court. Contrary to the defendant's bare assertion to the contrary, there is no indication that the court failed to consider Baranoski's qualifications and expertise in considering the test's validity.

There also is no indication that the court misapplied the *Daubert* analysis. The court was free to weigh the *Daubert* factors as it deemed appropriate. As our Supreme Court has stated, the factors "are *not* exclusive. Some will not be relevant in particular cases; and some cases will call for considerations not discussed herein. The factors a trial court will find helpful in determining whether the underlying theories and techniques of the proffered evidence are scientifically reliable will differ with each particular case. . . . Indeed . . . a mechanical list of mandatory factors would frustrate the entire concept underlying the *Daubert* approach." (Citations omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Porter*, supra, 241 Conn. 84. The record supports the court's findings, and the court properly applied the *Daubert* analysis. On the basis of its findings, the court did not abuse its discretion in deeming the Grisso related testimony unreliable and, therefore, irrelevant evidence.

## II

The defendant next claims that the court improperly admitted into evidence testimony concerning his oral confession after concluding that he had knowingly,

intelligently and voluntarily waived his *Miranda* rights. The defendant argues that the court's failure to suppress his confession violated his privilege against self-incrimination, guaranteed by the fifth and fourteenth amendments to the United States constitution, and article first, § 8, of the constitution of Connecticut. The defendant also argues that the state failed to prove that he had knowingly, intelligently and voluntarily waived his right to counsel. We disagree.[6]

The following additional facts are relevant. In its memorandum of decision on the defendant's motion to suppress, the court specifically addressed the defendant's claims. The court made several factual findings. It found that during the interview that Dease and Burton conducted, the defendant was accompanied by Hazel Griffin, his adoptive mother and grandmother, Denise Jacobs, his biological mother, and Leland Griffin, his uncle. The court noted that the defendant made several statements to Dease and Burton during the interview; some statements were recorded, and others were not recorded.

The court noted that it considered the "totality of the circumstances" in determining whether the state met its burden of proving that the defendant validly waived his *Miranda* rights. The court specifically found the testimony of Dease and Burton "to be credible with respect to what factually occurred during the questioning." The court also noted that it had considered Baranoski's testimony, insofar as it concerned matters unrelated to the Grisso testing, as well as the testimony

---

[6] We limit our review of the issues to the defendant's claims under the United States constitution. "We have repeatedly apprised litigants that we will not entertain a state constitutional claim unless the [party] has provided an independent analysis under the particular provisions of the state constitution at issue . . . ." (Internal quotation marks omitted.) *State* v. *Cruz*, 75 Conn. App. 500, 505 n.5, 816 A.2d 683, cert. granted on other grounds, 263 Conn. 921, 822 A.2d 243 (2003).

of Howard Creasey, the defendant's juvenile probation officer. The court found "by a preponderance of the evidence that the defendant, after he received his appropriate *Miranda* warnings with respect to his constitutional rights, did knowingly, voluntarily and intelligently waive those rights."

Before reaching the merits of the defendant's claim, we set forth the relevant legal principles and our standard of review. "The purpose of *Miranda* warnings is to assure that a confession is the product of an essentially free and unconstrained choice by its maker. . . . The state has the burden of proving by a preponderance of the evidence that the defendant knowingly and intelligently waived his *Miranda* rights, including his right to remain silent. . . . [T]he state must demonstrate: (1) that the defendant *understood* his rights, and (2) that the defendant's *course of conduct* indicated that he did, in fact, waive those rights. . . . In considering the validity of [a] waiver, we look, as did the trial court, to the totality of the circumstances of the claimed waiver. . . .

"The determination of [w]hether a defendant has knowingly and intelligently waived his rights under *Miranda* depends in part on the competency of the defendant, or, in other words, on his ability to understand and act upon his constitutional rights. . . . To determine whether an individual had the capacity to understand the warnings, the trial court may consider: the defendant's experience with the police and familiarity with the warnings, his level of education, his intelligence including his IQ, his vocabulary and ability to read and write in the language in which the warnings were given, his age, intoxication, his emotional state and the existence of any mental disease, disorder or retardation." (Citation omitted; emphasis in original; internal quotation marks omitted.) *State* v. *Santiago*, 245 Conn. 301, 320–21, 715 A.2d 1 (1998). "Although

the issue is . . . ultimately factual, our usual deference to factfinding by the trial court is qualified, on questions of this nature, by the necessity for a scrupulous examination of the record to ascertain whether such a factual finding is supported by substantial evidence." (Internal quotation marks omitted.) *State* v. *Hafford*, 252 Conn. 274, 295, 746 A.2d 150, cert. denied, 531 U.S. 855, 121 S. Ct. 136, 148 L. Ed. 2d 89 (2000).

Our scrupulous review of the record reveals the following evidence. Dease testified that after the defendant was arrested and brought to the police department, police contacted his legal guardian, Hazel Griffin, who thereafter arrived at the police department with the defendant's biological mother and uncle. Dease further testified that the defendant was not questioned until he was accompanied by Hazel Griffin.[7]

---

[7] The defendant in his principal brief also argues that the court "did not consider whether Hazel Griffin . . . understood the *Miranda* rights herself or whether she assisted [the defendant] in understanding them." In his reply brief, the defendant argues that the court should have considered the effect of Hazel Griffin's understanding of the *Miranda* warnings on the defendant's understanding of such warnings. The court made no factual findings with respect to the issue of whether Hazel Griffin understood the *Miranda* warnings read to her and to the defendant. The court also did not make any factual findings with regard to whether she assisted the defendant in understanding those warnings. We conclude that the issue is irrelevant to our analysis.

The defendant appears to base that aspect of his claim on General Statutes § 46b-137 (a), which provides in relevant part that "[a]ny admission, confession or statement, written or oral, made by a child to a police officer . . . shall be inadmissible in any proceeding concerning the alleged delinquency of the child making such admission, confession or statement unless made by such child in the presence of his parent or parents or guardian and after the parent or parents or guardian and child have been advised (1) of the child's right to retain counsel, (2) of the child's right to refuse to make any statements and (3) that any statements he makes may be introduced into evidence against him." The defendant also refers to General Statues § 46b-133 (e), which requires a police officer who has detained a child to first notify, or make a reasonable effort to notify, such child's parents or guardian of the "intended action" and to file a written statement setting forth the alleged delinquent conduct of such child.

The defendant does not dispute that police notified his guardian, Hazel Griffin, of his arrest or that she was present during his interview. Further-

Dease testified that he thereafter met with both the defendant and Hazel Griffin. Dease testified that he gave them printed forms that contained a statement of the *Miranda* rights. The forms also contained a section where a person under interrogation could indicate that he or she had been advised of such rights and that, being so advised, he or she wanted to waive the rights and answer questions. Dease testified that he "explained to both Mrs. Griffin and [the defendant] that if they didn't want to talk to me, they didn't have to. Also, if they need a lawyer, one would be appointed for them, and both of them, both Mrs. Griffin and [the defendant], said they understood and they wanted to talk to me." Dease testified that the defendant and Hazel Griffin indicated that they understood the defendant's *Miranda* rights and that both of them executed the form that was given to them. In so doing, each initialed their form in six separate places and each signed the form on the bottom. The executed forms, admitted as full exhibits at the hearing, reflect that Dease and Burton witnessed the execution of the forms.

Dease stated that after the defendant and Hazel Griffin had signed the forms, he began to question the defendant. He recalled that he, Burton, the defendant, Hazel Griffin, Leland Griffin and Jacobs were present and were sitting around a large table. Dease also recalled that the tone of the conversation was quiet and that neither he nor Burton made any effort to coerce or to threaten the defendant. Dease testified that "[a]t first the defendant denied any involvement, but shortly thereafter he told us that he wanted to tell us the truth" and that he thereafter related his version of events,

more, the defendant cannot prevail on his claim that the state needed to demonstrate anything with regard to Hazel Griffin's understanding of his *Miranda* rights. Our Supreme Court has recently held that the protections afforded by § 46b-137 (a) are "inapplicable to confessions made by children who are prosecuted as adults in criminal court." *State* v. *Ledbetter*, 263 Conn. 1, 18, 818 A.2d 1 (2003). Such a situation exists in the present case.

including his confession regarding the victim's homicide.

Dease related how, during the interview, he showed the defendant photographs depicting Little, Greene, Lester, Jones and the victim, and that the defendant identified each person in the photographs, but refused to sign the photographs. Dease also testified that after the initial phase of the interview, he wanted to record his questions and the defendant's responses, and that the defendant indicated that he did not want to talk about the homicide or the robbery on tape. Dease further testified that he nonetheless taped part of his subsequent interview of the defendant and that while being recorded, the defendant refused to admit to anything about the homicide. Dease testified that during that entire interview process, the defendant did not ask for an attorney, did not indicate that he did not understand his rights and did not complain about anything whatsoever.

Burton testified that he was present during the defendant's interview. He testified that Dease apprised the defendant and Hazel Griffin of the defendant's *Miranda* rights by reading them from a form. Burton recalled observing the defendant and Hazel Griffin sign the forms. Burton also recalled that the defendant indicated that he understood his rights. Burton testified that during the initial phase of the interview, the defendant did not ask for an attorney and did not ask Dease to stop questioning him.

The court considered the foregoing testimony, which it characterized as "credible with respect to what factually occurred during the questioning," along with other evidence adduced at the hearing. Specifically, the court heard testimony from Howard Creacy, a juvenile probation officer. Creacy testified that beginning in 1994, he had met with the defendant and Hazel Griffin on

numerous occasions. Creacy testified that the defendant had been previously arrested for, among other crimes, burglary, breach of the peace, violating court orders and possession of marijuana. Creacy testified that in his professional capacity, he had informed the defendant and Hazel Griffin of the defendant's *Miranda* rights on those occasions. Creacy explained that on each occasion, he had read a statement of *Miranda* rights to the defendant and Hazel Griffin, inquired whether they understood those rights and asked them to sign a written form indicating that they understood the rights. Creacy also testified that in connection with prior arrests, the defendant had indicated that he understood and wanted to waive his *Miranda* rights.

The court noted that it had considered the totality of the circumstances surrounding the defendant's statement. The defendant does not dispute that the police gave him his *Miranda* warnings, that he and Hazel Griffin indicated that they understood the warnings or that he and Hazel Griffin signed written forms explicitly indicating that they understood the rights and that he decided to waive them.

The evidence demonstrates that the defendant was familiar with the *Miranda* warnings as a result of his prior arrests and prior decisions to waive his rights. With respect to his education and ability to read and write, Baranoski testified that the defendant scored in "the low, average range" on a standard intelligence test for children, possessed sixth grade reading skills and showed no signs of psychotic illness. She also testified that the defendant has the ability to learn and that he demonstrated only a mild to moderate delay in intellectual development. There was no indication or claim that the defendant was intoxicated or under the influence of drugs at the time of his confession.

The court heard testimony about the atmosphere of the meeting at the police department. Leland Griffin,

who was present during the interrogation, described
Dease and Burton as having exhibited "courteous and
polite" conduct. Likewise, Dease and Burton testified
that the questioning was calm and that the defendant
was seated comfortably during the interview. The
defendant's conduct during the interview is telling, as
well. According to Dease, the defendant initially denied
any involvement in the crimes. The defendant thereafter
told Dease, however, that he "wanted to tell . . . the
truth" and confessed to the crimes. Furthermore,
Dease's testimony reflects that the defendant exercised
a telling degree of control during the interview; as Dease
explained, the defendant exercised his right not to
answer questions later during the interview and also
refused to initial photographs given to him during the
interview.[8]

The foregoing evidence supports the court's finding
that the defendant possessed the capacity to understand
his rights, and that he intelligently and knowingly waive
them. The defendant apparently argues that Baranoski's
conclusions were binding on the court. The defendant
in his principal brief posits that "[t]he court did not

---

[8] The defendant also argues that Dease "created confusion" during the
interview. That complaint flows from Dease's testimony that after he read
the defendant his *Miranda* rights from the printed form, he asked the
defendant if he waived his right to talk to the police. Dease testified that
the defendant responded affirmatively. Dease also testified that he believed
that when a person being interrogated waives his or her right to talk to him,
such action reflects that such person wants to talk to him. Notwithstanding
Dease's apparent misunderstanding of the meaning of "waiver," the issue
is whether the defendant comprehended his *Miranda* rights. Dease testified
that he read to the defendant and Hazel Griffin from a written copy of the
*Miranda* warning on the form that they later signed. That warning was
legally accurate, and Dease advised the defendant in accordance with those
proper written warnings. We find no merit to the defendant's claim that
Dease's subsequent misstatements somehow "added to [his] confusion"
relative to his rights. There is no evidence that the defendant was confused
as to what his rights were in the first place, and we decline to infer that
Dease in any way confused the defendant by emphasizing, as the defendant
argues, that he "had a right" to speak to Dease.

consider Baranoski's admissible testimony that [his] low, average IQ of 79, his chronic absence from school, his drug addiction and developmental delay made it difficult for [him] to understand and form concepts using words alone. This only increased the probability that he did not understand his *Miranda* rights." It suffices to state that Baranoski's conclusions certainly were not binding on the court. The fact that the court did not consider them as true does not in any way indicate that it ignored them. Furthermore, the defendant's arguments in that regard are unavailing. The defendant's grade school education level and lower level IQ scores did not require a finding that he did not understand his rights. See *State* v. *Santiago*, supra, 245 Conn. 322. "[T]here is no requirement that a person be literate before his confession may be received into evidence." *State* v. *Madera*, 210 Conn. 22, 44, 554 A.2d 263 (1989). The totality of the circumstances, including the defendant's conduct during the interview, his life experiences and certain assurances that he understood his rights all support the court's finding that he understood his rights and voluntarily[9] waived them.

### III

Finally, the defendant claims that the court improperly failed to suppress his oral statement after concluding that he had not exercised his right to remain silent. We disagree.

The defendant claims, essentially, that prior to giving his confession during the pretaped portion of the inter-

[9] To a lesser extent, the defendant also argues that he did not voluntarily waive his rights. We find no merit to that aspect of his claim. The defendant argues in his principal brief that "[f]amilial coercion" occurred during the interview process when Hazel Griffin and Leland Griffin told him several times to " 'tell the truth.' " The court did not find that the defendant had been coerced in any way, but credited the testimony of Dease and Burton, who testified that nobody made any efforts to coerce the defendant into giving his statement.

view, he asserted his right to remain silent, and that Dease and Burton disregarded his request. At the hearing on the motion to suppress, the court considered the defendant's claim that the statements he made during both the pretaped and taped portions of his interview were made after he asserted his right to remain silent. He claimed that Dease and Burton continued to question him in contravention of his constitutional right to remain silent. The court disbelieved the defendant's claim and "accept[ed] the testimony of Dease and Burton that during the oral pretape statement, [the defendant] did not request that the questioning stop." Accordingly, the court found that the state had proven "by a preponderance of the evidence that with respect to the oral pretape statement . . . that it did not violate the defendant's constitutional right to stop answering questions." The court found otherwise with regard to a substantial portion of the defendant's taped interview and, as discussed previously, deemed statements contained therein inadmissible.

The rule of *Miranda* v. *Arizona*, supra, 384 U.S. 473–74, states: "Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked." The admissibility of statements obtained after a person has exercised his or her right to remain silent "depends under *Miranda* on whether his right to cut off questioning was scrupulously honored." (Internal quotation marks omitted.)

*Michigan* v. *Mosley*, 423 U.S. 96, 104, 96 S. Ct. 321, 46 L. Ed. 2d 313 (1975).

We already have concluded in part II B that substantial evidence supports the court's finding that the defendant expressly waived his *Miranda* rights prior to the interview and that the record supports the court's finding that he did so knowingly, intelligently and voluntarily. The issue before us now is whether the court properly concluded that the defendant had not exercised his right to terminate the interview prior to the time that police began to record the interview.

The issue is inherently factual. The court set forth its factual findings, and the fact that it credited the version of events set forth by Dease and Burton at the hearing on the motion to suppress. Although we need not reiterate in detail every aspect of that version of events, we do note that Dease testified that after the defendant had expressly waived his right to remain silent, he began to ask the defendant questions and that the defendant did not express a desire to cease the interview or to remain silent until such time as the detectives wanted to begin recording the defendant's statements. Burton's testimony corroborated that version of events.[10]

---

[10] The defendant claims that Dease and Burton testified differently at trial in that both witnesses testified at trial that they could not recall whether the defendant had expressed a desire to remain silent prior to or during the pretaped interview. The defendant asked the court to reconsider its earlier pretrial ruling in light of the trial testimony of those witnesses. The defendant argues in his brief that the court denied that subsequent motion to suppress and, in so doing, relied on the detectives' testimony at the hearing on the motion to suppress. The defendant argues that the court "failed to consider" the trial testimony and that it improperly failed to reconsider its earlier ruling.

Our review of the record reveals that the court, after hearing counsel's arguments concerning the trial testimony of Dease and Burton, and after hearing defense counsel's argument that Dease and Burton had testified differently at trial than they had during the hearing on the motion to suppress, did revisit its earlier ruling and found the defendant's argument to be without merit. The defendant properly characterized the issue before the court con-

The court was free to consider not only the fact that the defendant indicated to Dease that he would waive his right to remain silent, and that he signed and initialed a written waiver of his right to remain silent, but also the fact that he answered the questions asked of him. By all accounts, the tenor of the interview was relaxed and calm. The record reflects that the defendant provided narrative answers to the questions asked of him. "His overall attitude and conduct exhibited a streetwise familiarity with police procedures, and we are confident that he knew that he did not have to say anything but chose to talk nonetheless." *State* v. *Aversa*, 197 Conn. 685, 697, 501 A.2d 370 (1985).

The court made credibility assessments in considering the totality of the circumstances surrounding the issue of waiver. We are unable to disturb such findings because they are supported by the evidence adduced at the hearing on the motion to suppress and by the testimony elicited at trial. The court found that the defendant had not expressed a desire to remain silent prior to or during the pretaped portion of the interview. For that reason, the court properly concluded that the defendant had waived his privilege to remain silent and, prior to the pretape interview, did not assert his right to discontinue the interview.

The judgment is affirmed.

In this opinion the other judges concurred.

---

cerning any discrepancy in testimony to be one of "credibility." The court concluded that it had evaluated the "totality of the circumstances" at the time of the hearing on the motion to suppress and stated: "Still looking at the totality of the circumstances, the ruling does not change." The record supports the court's finding that the trial testimony of Dease and Burton did not change in any significant manner the factual basis of the court's ruling on the motion to suppress.