THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ROOSEVELT PHILLIPS, Defendant-Appellant.

Second District    No. 2—90—0479

Opinion filed March 27, 1992.

G. Joseph Weller and David W. Devinger, both of State Appellate Defender's Office, of Elgin, for appellant.

Michael J. Waller, State's Attorney, of Waukegan (William L. Browers and David A. Bernhard, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE BOWMAN delivered the opinion of the court:

The defendant in the instant case, Roosevelt Phillips, along with Jeff Musgrove and Danny Graham, was charged by indictment with first degree murder (Ill. Rev. Stat. 1987, ch. 38, par. 9—1(a)), conspiracy to commit armed robbery (Ill. Rev. Stat. 1987, ch. 38, par. 8—2) and attempted armed robbery (Ill. Rev. Stat. 1987, ch. 38, par. 8—4(a)). Following a jury trial in the circuit court of Lake County, defendant was found guilty of the above offenses and sentenced to a term of 70 years' imprisonment. On appeal defendant contends that: (1) the trial court's denial of his motion to suppress certain statements to police was against the manifest weight of the evidence because (a) defendant did not knowingly and intelligently waive his *Miranda* rights, (b) the trial court improperly focused on whether defendant's statements were voluntary rather than whether the waiver of his rights was knowing and intelligent, and (c) the trial court mistakenly believed that defendant was not constitutionally entitled to a hearing on his motion to suppress since he denied making the statements; and (2) the trial court's imposition of sentence was an abuse of discretion. We affirm.

As defendant does not challenge the sufficiency of the evidence to prove his guilt beyond a reasonable doubt, we review only those facts necessary to our resolution of the specific issues presented on appeal. The record reveals that the victim, Stanley Hamilton, was shot and killed during a robbery attempt in the early morning hours of August 24, 1988, while he was working at a Sears surplus outlet store. Prior to trial, defendant moved to suppress his incriminating statements to authorities regarding his involvement in the incident. The evidence presented at the motion to suppress hearing is discussed below.

Following his arrest on August 27, 1988, defendant was placed in an interview room at the Waukegan police department, whereupon he was interviewed by Officers Fernando Shipley and Phillip Stevenson. Officer Shipley advised defendant of his constitutional rights under *Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602. Shipley read defendant each *Miranda* warning separately and asked him if he understood each warning. Defendant responded that he understood after each sentence what was read to him regarding his rights. From the same preprinted form, Shipley also read to defendant an acknowledgement of waiver of rights. Defendant stated that he understood the waiver. Shipley then gave the form to defendant to read. Defendant "appeared to read" the form and then placed his signature at the bottom of the form. According to Shipley, defendant did not say or do anything to indicate that he did not understand his rights.

After initially denying any involvement in Hamilton's death, defendant stated that he went to the Sears store with Jeff Musgrove and Danny Graham, but only to act as a lookout while Musgrove and Graham robbed Hamilton. Shipley and Stevenson compared this account of this incident with a statement given by Graham and determined that defendant's version was not feasible. The officers then returned to the interview room, showed defendant some photographs of the victim and reviewed defendant's prior statement. At that point, defendant admitted that he was the person who shot Hamilton.

Officer Stevenson reduced defendant's statement to writing, prepared a two-page typewritten statement of defendant's account and made copies of the typed document. Stevenson read the statement to defendant and asked him to make whatever corrections he thought were necessary. Defendant was given a copy of the statement and was allowed to read along with Stevenson. Defendant had the officers make two changes. The first change added the word "ruthless" to the statement. The second change added the words, "I wasn't supposed to shoot the guy, but he came out with a gun so he would have shot me. I didn't shoot him first." After Stevenson made the appropriate corrections, defendant placed his signature at the bottom of both pages of the two-page statement and initialed both corrections.

According to the officers, defendant never indicated that he wanted to remain silent or that he wanted an attorney. Defendant was not struck or threatened with physical violence. Defendant was not agitated when the statement was read and never interrupted to say he did not commit the offense.

Dr. George Baroff, a psychologist, testified for defendant at the suppression hearing. Dr. Baroff administered several tests to and evaluated defendant. Among the tests Dr. Baroff administered was the Vineland Adaptive Behavior Scale, which focused on defendant's adaptive behavior relative to his ability to function in daily living, language skills and interpersonal relationships. Dr. Baroff concluded that defendant fell within the moderately retarded range on the Vineland scale.

Dr. Baroff also gave defendant the Stanford-Binet test to determine his general intelligence. Dr. Baroff determined that defendant was functioning at a mental age of nine years two months, and that the corresponding intelligence quotient (IQ) for that mental age, given the defendant's chronological age of 18, was 56.

The third test Dr. Baroff administered was the Wide Range Achievement Test, to determine defendant's reading ability. Defendant was found to function at a second-grade level.

Regarding the understanding of *Miranda* warnings, Dr. Baroff noted that the mere presence of mental retardation did not necessarily preclude an understanding of the warnings. Dr. Baroff determined that the material contained in the *Miranda* warnings was at a seventh-grade level of reading difficulty and that the corresponding chronological age for comprehension was a child between the ages of 12 and 13. Dr. Baroff also stated that he would not expect a nine-year-old to be able to understand *Miranda* warnings without careful explanation.

Dr. Baroff reviewed the *Miranda* warnings with defendant several times. He first determined that defendant could not read the *Miranda* warnings himself. He next evaluated defendant's understanding of each *Miranda* warning. After reviewing each warning, Dr. Baroff went through another version of *Miranda* warnings which had been developed by Professor Grisso at Washington University in St. Louis.

Dr. Baroff first tested defendant's comprehension as to the traditional *Miranda* warnings. According to Baroff, defendant interpreted the phrase "you have the right to remain silent" as "don't make any noise." Defendant interpreted the second phrase, "anything you say can and will be used against you in a court of law," to mean "you're held in a court of law for your hearing, bond reduction." The third warning, "you have the right to consult with a lawyer before you answer any questions or make any statements and to have him present during questioning," was first interpreted to mean "you can talk to your lawyer." After further questioning regarding this warning,

defendant asked, "what the hell is consult." Defendant interpreted the last warning, "if you cannot afford a lawyer, one will be appointed for you before questioning or at any time during questioning if you so desire," to mean "they going to give you a person, a person, to help you go over the questions."

The first *Miranda* warning as developed by Professor Grisso read, "you do not have to make a statement, and have the right to remain silent." Defendant interpreted this phrase to mean, "be quiet when he's talking to you." In response to "anything you say can and will be held against you in a court of law," defendant replied, "that you be in a court of law, taken to the court because they want you to be there." In response to the phrase "you're entitled to consult with an attorney before interrogation and to have an attorney present at the time of interrogation," defendant replied, "I don't know consult; interrogation, beating up people." Defendant interpreted the fourth statement, "if you cannot afford an attorney, one will be appointed for you," as "you don't have any money, and they get someone to go over the questions to help you out." Defendant also stated that the phrase "to help out" meant "to help you understand the questions, to make sure you know what's going on."

It was Dr. Baroff's opinion that defendant "essentially has no understanding of his *Miranda* rights; that his understanding is extraordinarily deficient. His understanding is so deficient that apparently he has not even recognized the very basic assumptions which underlie the *Miranda* rights." Dr. Baroff also stated that he did not believe defendant had been faking his responses during the *Miranda* comprehension evaluations. Based on his evaluations, Dr. Baroff concluded that defendant could not have made a knowing and intelligent waiver of his *Miranda* rights.

On cross-examination Dr. Baroff acknowledged that he was aware of a Beta IQ examination in 1986 which showed defendant at an IQ level of 89. Dr. Baroff stated, however, that the Beta test was obsolete and was no longer used. Another test given in 1980 revealed defendant's IQ to be 70, and a Wexler Intelligence Scale for Children in 1981 revealed a full-scale IQ of 65.

Dr. Daniel Rybicki, a clinical psychologist, also testified on defendant's behalf at the suppression hearing. Dr. Rybicki administered several tests to defendant and concluded that defendant suffered from mild retardation. Dr. Rybicki also disregarded the usefulness of the Beta IQ test. According to Dr. Rybicki the full scale IQ of 76, which defendant was determined to have scored in 1979, was probably a result of the difference between the Wexler Intelligence Scale for

Children test and the Wexler Adult Intelligent Scale. Dr. Rybicki was of the opinion that "the 65's and 70's are most likely representative samples of [defendant's] full scale intellectual function." Defendant scored a 23 on the wide-range achievement test, which placed him below a third-grade level of reading ability.

Waukegan Alderman Robert Evans also testified in defendant's behalf. Evans had known defendant for several years and was familiar with his educational background. Evans stated that he was aware that defendant had mental problems "[b]ecause there was a kind of a long history of fire settings and things of that nature; and he set my house on fire and at that time I worked to have him committed to an institution to get him some help."

Evans knew that defendant was being sought by police in connection with Hamilton's death and contacted police in order to help them apprehend defendant. Evans eventually brought defendant to the police station and turned him over to the police. At that time, Evans told the police that the defendant had mental problems, that defendant had a history of setting fires, and that he had been in several institutions.

The defendant also testified at the suppression hearing. Defendant denied telling police that he shot a Sears security guard or that he participated in the planning of the robbery or that he was in the Sears store tent on the night of the shooting. When defendant signed the statement that is the subject of the motion to suppress, he thought he was signing a paper regarding stolen Cadillac automobiles.

According to defendant, after he was brought into an interrogation room, he was told by police, "you going to tell us who did this." One of the police officers then showed defendant some pictures of clothes, pictures of guns, and pictures of a dead person. The police told him that, "if you don't tell us who did it or what could have happened, we are going to blame it on you like they did in Chicago about the Cadillacs." Defendant also stated that one of the police officers slammed him up against a wall.

The police were questioning defendant about his involvement with a stolen Cadillac. At one point defendant stated that the officers came into the interrogation room with a piece of paper that had "a whole bunch of words on it." One of the officers then told defendant to mark the paper so as to indicate that he had been in a particular car. The officer then told defendant to place his initials in a certain place and also asked him to sign the document. After signing the document, defendant asked the officers to read the paper back to him. When the statement was read, defendant indicated that "there was some way-

out shit I never heard before." Defendant stated that he did not read the statement because he was unable to do so.

The parties subsequently stipulated that if Lieutenant St. Clair were called to testify he would state that, during an arrest of defendant for an unrelated offense in 1987, defendant stated with regard to his *Miranda* warnings, "Don't read them to me; I know them; and I'm not going to talk." Also admitted into evidence were various inmate request forms, which had been introduced at defendant's prior fitness hearing for the proposition that defendant could write.

At the close of all the evidence the trial court denied defendant's motion to suppress, stating in pertinent part as follows:

> "On the stand, [defendant] has understood questions *** which were not simple, which were not put together well, which he understood completely. ***
>
> * * *
>
> He does not have an IQ of a level of the ordinary adult of his age would or should have; and it's below the standard that is used. I think the evidence supports that. Taking into consideration that the defendant with that particular fact clear, but also observing the defendant and his responses to questions and his response and his outbursts to testimony on the stand, it's clear and unequivocal [*sic*] that he understands communications substantially better than your psychologist suggested in his opinion of the defendant not understanding his rights; and I find his testimony totally incredible and unbelievable as to his testing of the defendant and his opinion as to the defendant not understanding his rights.
>
> Very frankly, from the testimony I would find that the defendant did in fact understand his rights and knowingly waived his rights. Arguendo if he did not, this is a clearcut Connolly [*sic*] case where there was no action by the police using his mental state in any manner, way, or form so as to encourage or in any other way obtain his waiver of Miranda ***.
> ***
>
> Notwithstanding that, I would find from the evidence that the police did not act improperly, nor did they coerce the defendant in any way, nor were the statements made by the defendant involvuntary [*sic*] *under any of the standards of law*; and the motion is denied." (Emphasis added.)

As stated, defendant maintains that the trial court erred in denying his motion to suppress for several reasons. First, he argues that he did not knowingly and intelligently waive his constitutional rights

under *Miranda*. He contends that the trial court erred in disregarding testimony which established his inability to knowingly and intelligently waive these rights. We cannot agree.

When the State seeks to admit a defendant's confession at trial, it must first prove that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to counsel. (*Miranda v. Arizona* (1966), 384 U.S. 436, 475, 16 L. Ed. 2d 694, 724, 86 S. Ct. 1602, 1628.) In determining whether a defendant knowingly and intelligently waived his *Miranda* rights, the court must consider the totality of the circumstances, including the characteristics of the defendant and the details of the interrogation. (*People v. Turner* (1973), 56 Ill. 2d 201, 205-07.) The characteristics which must be examined are those which bear upon a defendant's ability to make knowledgeable and independent decisions, such as age, intelligence, prior experience with the criminal law and emotional stability. *People v. Racanelli* (1985), 132 Ill. App. 3d 124, 132.

Evidence of a defendant's limited intellectual or mental capacity, standing alone, does not necessarily indicate that the defendant is incapable of waiving his constitutional rights and making a confession. (*People v. Kokoraleis* (1986), 149 Ill. App. 3d 1000, 1013.) Rather, such evidence is but one of the issues to be considered in reviewing the totality of the circumstances under which the confession is made. (*Kokoraleis*, 149 Ill. App. 3d at 1013.) It is also important to note that the police are not required, as a prerequisite to accepting a defendant's waiver, to conduct a mental examination of the defendant in order to ascertain his ability to comprehend his constitutional rights. (149 Ill. App. 3d at 1013.) While the State must prove that a statement was made knowingly, intelligently, and voluntarily, where a trial court so finds after application of the proper legal standards, review on appeal is limited to whether that finding is contrary to the manifest weight of the evidence. *Racanelli*, 132 Ill. App. 3d at 133, citing *People v. Kincaid* (1981), 87 Ill. 2d 107, 116-18, *cert. denied* (1982), 455 U.S. 1024, 72 L. Ed. 2d 144, 102 S. Ct. 1726.

■■ Applying the above principles to the facts of the instant case, we cannot conclude that the trial court's denial of defendant's motion to suppress was against the manifest weight of the record evidence. Contrary to defendant's contention that the trial court ignored his evidence, the trial court made specific findings that defendant was mildly retarded and that he had a below-standard IQ. That the court nonetheless found that defendant had made the requisite waiver of his rights does not alone require a conclusion that it ignored defendant's evidence. The trial court also found that the defendant, while testify-

ing, was able to understand and responded to relatively complex questions. That the trial court may have primarily emphasized its observations of defendant during his testimony does not mean that it erred in denying his motion to suppress. It has been recognized that the trial court is in a better position than a court of review to evaluate a defendant's ability to understand his rights. (*People v. Ellison* (1984), 126 Ill. App. 3d 985, 992.) Obviously, this fact encompasses the trial court's observations of the defendant when he chooses to testify at a suppression hearing and its evaluation of his ability to respond to verbal questioning. *Ellison*, 126 Ill. App. 3d at 994.

Defendant argues that the police were advised of his mental problems by Alderman Robert Evans, but nevertheless failed to insure that defendant understood his constitutional rights. However, the State correctly notes that the mental problems to which Alderman Evans referred concerned primarily defendant's propensity to set fires. Evans did not testify that he told police that defendant had a low IQ or that he was unable to understand *Miranda* warnings. Moreover, there is no evidence in the record indicating specifically to whom Evans spoke regarding defendant's mental state. Evans did not mention Officers Shipley or Stevenson in his testimony; he simply states that the police were aware of defendant's mental problems.

Defendant also argues that the trial court erred when it rejected the expert testimony of Drs. Baroff and Rybicki. We disagree. First, it is clear that the trial court did not completely reject defendant's expert testimony. The trial court agreed with the experts' conclusions that defendant was to some degree mentally retarded and that he had a low IQ. The trial court's disagreement with the experts concerned defendant's ability to knowingly and intelligently waive his *Miranda* rights.

In addition, the case law cited by defendant in support of his argument that the court erred in disregarding expert testimony is clearly distinguishable. In *People v. Williams* (1980), 87 Ill. App. 3d 860, the issue on appeal was whether the trial court erred in finding the defendant fit to stand trial. In concluding that the trial court's finding of fitness was against the manifest weight of the evidence, this court noted that the only testimony presented at the fitness hearing indicated that the defendant was not fit to stand trial. Both the State's and the defendant's expert witnesses testified that the defendant was unable to assist in his defense. Quite unlike the facts in the instant case, the defendant in *Williams* did not testify at the hearing or at trial, and the trial judge's personal observation of the defendant

regarding his fitness for trial consisted merely of brief exchanges of casual conversation. *Williams,* 87 Ill. App. 3d at 864.

Similarly, in *People v. Janecek* (1989), 185 Ill. App. 3d 89, on the issue of a defendant's sanity, the appellate court found no substantial disparity between the State and defense witnesses regarding the defendant's capacity to conform her conduct to the requirements of the law. Unlike the facts present in this case, the testimony of a police officer in *Janecek* tended to support that of the defense psychiatrist and defendant's former husband that defendant was not sane. *Janecek,* 185 Ill. App. 3d at 94.

On the record before us we cannot say that the trial court failed either to consider pertinent evidence or to give any evidence its proper weight. The trial court clearly considered the expert testimony, but deduced that the conclusions as to defendant's ability to understand *Miranda* warnings were not persuasive. Under the facts of this case, the trial court was not required to accept defendant's experts' conclusions of fact. *Kokoraleis,* 149 Ill. App. 3d at 1014; *Racanelli,* 132 Ill. App. 3d at 133.

Considering the totality of the circumstances, we conclude that the trial court's denial of defendant's motion to suppress was not against the manifest weight of the evidence. Defendant was advised of his constitutional rights under *Miranda.* He was advised of his rights both orally and in writing. While defendant had opportunities to tell the police that he did not understand the rights as they were read to him, he did not do so. Defendant told police that he understood the rights read to him. He gave both oral and written waivers of his rights. Importantly, defendant also had prior experience with the criminal justice system and therefore was not unaware of his rights.

While the expert testimony was a factor in defendant's favor, it was the trial court's responsibility to judge the credibility of the witnesses and to consider and weigh each of the factors. (*Racanelli,* 132 Ill. App. 3d at 129.) The trial court heard defendant's testimony and observed his demeanor on the witness stand. The record clearly indicates that the trial court properly considered all of the relevant circumstances in this case. Consequently, we do not believe that the court's decision to deny defendant's motion was against the manifest weight of the evidence.

Nor do we believe that defendant's cited cases compel a contrary conclusion. Defendant urges us to follow *People v. Redmon* (1984), 127 Ill. App. 3d 342, and *People v. Bernasco* (1990), 138 Ill. 2d 349, argu-

ing that these cases present factual situations closely analogous to the facts presented here.

In *Redmon,* the court reversed the finding of voluntariness of the confessions of a 17-year-old borderline mentally deficient defendant chiefly on the basis of his final written statement. The defendant there expressly stated during an interview with the police that he did not understand his right to talk to and be represented by a lawyer during questioning. After this was explained, the defendant asked that questioning cease. (*Redmon,* 127 Ill. App. 3d at 345-46.) No such evidence exists in this case. The defendant in *Redmon* never signed a written waiver of rights form. In contrast, defendant in this case did sign a written waiver form, and the testimony of Officers Shipley and Stevenson indicates that defendant at all times during questioning understood his rights. In addition, the record reveals that defendant had several prior experiences with the law, both as a juvenile and as an adult, while the *Redmon* defendant had not. For these reasons, we find *Redmon* to be inapposite.

*People v. Bernasco* involved an appeal by the State from an order of the trial court suppressing the confession of the defendant as involuntary. In its written order the trial court found that the defendant had an IQ of 80, a fourth-grade reading and comprehension level and no prior criminal experience. The trial court also noted that the testimony of the defendant indicated that he had substantial difficulty in understanding relatively routine questions. The Illinois Supreme Court affirmed both the trial court and the appellate court, stating as follows:

> "We do not sit to reweigh the evidence as if we were a trial court; a reviewing court will not disturb a trial court's determination on a motion to suppress evidence unless it is against the manifest weight of the evidence. [Citation.] Whether a defendant intelligently waived his right to counsel depends, in each case, on the particular facts and circumstances of that case, including the defendant's background, experience, and conduct. [Citation.] The trial court here reached its conclusion after hearing police, parental, and psychological testimony *and— what is very significant—making its own observations of defendant while he was testifying.*" (Emphasis added.) (*Bernasco,* 138 Ill. 2d at 368.)

*Bernasco* is clearly factually distinguishable from the instant case. Further, we believe that the supreme court's ultimate conclusion, focusing as it did on the trial court's observations of the defendant, actu-

ally supports our conclusion that the denial of defendant's motion to suppress was not against the manifest weight of the evidence.

■ Defendant also contends that the trial court's denial of his motion to suppress was improperly based upon whether the statements were voluntary rather than whether the defendant's waiver of *Miranda* rights was knowing and intelligent. We disagree. Based on its statements at the suppression hearing, as set forth earlier in this opinion, the trial court did in fact apply the proper standards in evaluating the admissibility of defendant's statements. The trial court considered defendant's experts' testimony on whether defendant knowingly and intelligently waived his rights, but disagreed with their conclusions in this regard. In his brief, defendant only discusses the court's statements regarding the voluntariness issue. In the process, he takes several of the court's comments out of context. Such an approach is both incomplete and misleading, and we consider it to be without merit.

■ Finally, defendant contends that the trial court mistakenly believed that he was not constitutionally entitled to a hearing on his motion since he had denied making any incriminating statements to police. We need not address this contention at length, as it is clear that the trial court in this instance conducted, and the defendant received, a thorough hearing on his motion to suppress. The court heard the testimony of eight witnesses and addressed all of defendant's concerns prior to rendering a decision. The hearing was most certainly not the *"pro forma* event with a predetermined conclusion," described by defendant.

The last issue raised by defendant on appeal is that the trial court abused its discretion in sentencing him to a 70-year term of imprisonment. Specifically, defendant contends that his 70-year sentence is unfair considering the fact that codefendant Jeff Musgrove was sentenced to a 50-year term of imprisonment. The standards we must apply in deciding this issue were articulated in *People v. La Pointe* (1981), 88 Ill. 2d 482:

> "[T]he standard of review to be applied in determining whether a sentence is excessive is: Did the trial judge abuse his discretion in imposing that sentence? [Citations.]
> 
> \* \* \*
> 
> The Unified Code of Corrections vests a wide discretion in sentencing judges in order to permit reasoned judgments as to the penalty appropriate to the particular circumstances of each case. [Citation.] We held in *Perruquet*, and emphasize here that 'the trial court is normally the proper forum in which a suitable

sentence is to be determined and the trial judge's decisions in regard to sentencing are entitled to great deference and weight.' " (*La Pointe,* 88 Ill. 2d at 492-93, quoting *People v. Perruquet* (1977), 68 Ill. 2d 149, 154.)

We also recognize that disparate sentences may be supported by either a more serious criminal record or greater participation in the offense. *People v. Treece* (1987), 159 Ill. App. 3d 397, 418.

█ Applying these principles here, we affirm the sentence imposed on defendant. We believe the record evidence and the trial court's statements of its reasons for imposing sentence reflect a proper exercise of the wide discretion vested in it to determine an appropriate sentence. In this regard, we reject defendant's contention that the court failed to adequately take into account his rehabilitative potential or his allegedly lesser culpability relative to that of Jeff Musgrove. The trial court explicitly recognized its duty to consider the possibility of rehabilitation and defendant's relative culpability, although it weighed these factors against the considerations that it should not deprecate the seriousness of the offense and the protection of society. Moreover, where mitigation evidence is before the court, it is presumed that the sentencing judge considered the evidence, absent some indication, other than the sentence imposed, to the contrary. *People v. Danis* (1984), 129 Ill. App. 3d 664, 670.

In view of the trial court's consideration of proper factors in mitigation and aggravation, defendant's arguments amount to a request that we balance the appropriate factors differently and independently conclude that his sentence is excessive. However, it is not our function to do so. *People v. Cox* (1980), 82 Ill. 2d 268, 280.

For all of the foregoing reasons, the denial of the motion to suppress, the judgment of conviction entered, and sentence imposed by the trial court are affirmed in their entirety.

Affirmed.

INGLIS, P.J., and WOODWARD, J., concur.